Filed 12/7/15  In re E.C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re E.C., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>R.J.,<br><br>    Defendant and Appellant. | E063502<br><br>(Super.Ct.No. SWJ1300188)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Timothy F. Freer, Judge.  Affirmed.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, Julie Koons Jarvi, Deputy County Counsel for Plaintiff and Respondent.

1

The juvenile court terminated R.J.'s (Father) parental rights to his son, E.C. (Minor). (Welf. & Inst. Code, § 366.26, subd. (b).)[1] Father contends the juvenile court erred by not applying the sibling relationship exception. (§ 366.26, subd. (c)(1)(B)(v).) We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

A.    <u>BACKGROUND INFORMATION</u>

Minor (male, born November 2009) had two half brothers: N.C. (born 2001) and D.W. (born 2006). D.W. was autistic. The half brothers' shared biological parent was their mother, M.C. (Mother). In April 2009, the half brothers' maternal grandparents, C.C. and B.D. (collectively, "Grandparents"), were appointed legal guardians of N.C., through the probate court. The three half brothers resided with Grandparents in Hemet, although Grandparents did not have formal custody of Minor and D.W. B.D. (Grandfather) explained that the children lived with Grandparents because Mother was "a prostitute and drug addict" and was unable to care for the children.

The children's fathers were not involved in the children's lives. Mother and Father had lived together for one month. Father resided in Los Angeles. Father was not named on Minor's birth certificate, and was not present when Minor was born. Father does not pay child support, but had contributed groceries, clothing, and bunk beds toward Minor's care.

---

[1] All subsequent statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

B.      <u>DETENTION</u>

On March 18, 2013, a social worker from the Riverside County Department of Public Social Services (the Department) responded to a referral alleging D.W. was the victim of physical abuse.  D.W. had bruising on the upper backside of his legs.  Without being asked, C.C. (Grandmother) said, "'Those don't even look like belt marks.'"  When the social worker asked three-year-old Minor what happened to D.W.'s legs, Minor responded, "'Papa did it.'"  When the social worker asked how "Papa" did it, Minor responded, "'with the belt.'"  N.C. said Grandfather strikes N.C. with a belt, but N.C. had not seen his half brothers struck with a belt.

The Department placed the children in protective custody.  There were no placements available that could take all three children.  Minor and N.C. were placed together in a foster home.  One day after he was placed in a separate foster home, D.W.'s foster parents gave notice that they were unable to manage his autism.  On March 21, 2013, D.W. was moved to the home of a non-related extended family member (NREFM), "who reportedly has extensive professional experience with students in special education programs."

The juvenile court found Minor came within section 300, subdivisions (a), (b), (g), and (j).  The court ordered the children detained.  The court granted Mother and Grandparents visitation with the children a minimum of two times per week.

C.    JURISDICTION/DISPOSITION

On April 25, N.C. and Minor were moved to separate foster homes, so the three children were in three separate homes. Minor and N.C. were moved due to the foster parent no longer tolerating N.C.'s "disrespectful, defiant and disruptive behavior."

The Department left voicemail messages for Father on April 7 and 8. On May 5, a social worker spoke with Father. Father was residing with one of his aunts, his three-year-old daughter, his seven-month-old son, and the mother of his daughter and infant son. Father questioned whether he was Minor's biological father. Father said he last visited Minor "just prior to the child being detained by the Department." The juvenile court ordered Father to participate in a paternity test. The test revealed Father was Minor's biological father.

On June 12, Minor's foster parent gave his/her seven-day notice of no longer being able to care for Minor The foster parent explained that, for the prior two weeks, Minor had been urinating and defecating throughout the house, such as on the floor; using profanity; and kicking and biting the other foster children.

The juvenile court found Father was Minor's biological father, and ruled he was Minor's presumed father. The court adjudged the three children dependents of the court, ordered them removed from Mother's physical custody, and ordered Minor removed from Father's physical custody. The court ordered one weekly visit between Father and Minor; one weekly visit between Mother and the three half brothers; one weekly visit between Grandparents and the three half brothers; and one weekly visit between the three half brothers.

4

D.     SIX-MONTH STATUS REVIEW

N.C. was returned to Grandparent's physical custody; however, on October 17 he was removed again due to his behavior "becoming increasingly more difficult to manage." N.C. was placed in a group home on October 17, and moved to a different group home on October 24. D.W. remained in his same NREFM placement. Minor was in a separate foster home, where he was placed on July 23. After switching homes, Minor stopped acting out. Both D.W. and Minor were doing well in their respective homes.

Father visited with Minor twice. Father failed to attend four visits. In early September, Minor's foster parents told Father to contact them when he would like to see Minor. As of November 26, the foster parents had not heard from Father. On August 6, during a visit between the half siblings and Grandparents, D.W. "was preoccupied with playing a videogame while [Minor] was interacting with grandparents and [N.C.]." On September 5, during a visit between D.W., Minor, and Grandfather, D.W. ate food that Grandfather brought while Minor played with blocks. D.W. interacted with Grandfather, while Minor "expressed a preference to play by himself."

E.     12-MONTH STATUS REVIEW

The children remained in their three separate placements. D.W. and Minor were doing well in their respective foster homes. Minor was the only child in his foster home, and had made "tremendous progress" while in the home. D.W.'s foster parent was willing to become his legal guardian. Minor's foster parent was willing to adopt

Minor. N.C. received Wraparound services for his behavior and mental health issues. N.C. returned to Grandparents' physical custody on June 12.

Since the beginning of the case 15 months prior, Father only visited Minor two times. During a November 14 visit between Minor, D.W., Grandparents, Mother, and a "little cousin," at a fast food restaurant, the children enjoyed playing with one another in "the slide/tunnel structure." D.W. and Minor visited with Mother on December 12. After the visit, the boys were "interactive but not very expressive." For example, Minor gave only one word answers to questions asked of him. During a visit with Mother, Minor, and D.W. on January 23, 2014, the boys played "nicely" individually and together. When Mother and the two boys visited on February 4, the boys were smiling and appeared "comfortable." During a March 27 visit with Grandparents, D.W., and Minor at a fast food restaurant, the two boys had "fun playing in the play area." N.C. declined to visit with Mother. However, "[h]e does enjoy visiting with his younger brothers when they are visiting with their maternal grandparents on Thursdays."

On July 1, 2014, the juvenile court found sibling relationships had been maintained as required by section 16002. The court ordered sibling visitation be facilitated by the Department. The court terminated Mother's and Father's reunification services. Mother and Father were granted visitation with Minor one time per month.

F.    TERMINATION

D.W.'s foster parent wanted to become his legal guardian. Minor's foster parents wanted to adopt him. Both children had strong bonds with their foster parents. D.W. had telephone visits with Mother. Minor visited with Mother in the Department's

6

offices, and visited with Grandmother via telephone calls. Mother and Grandparents sometimes failed to attend visits.

The court ordered that D.W.'s permanent plan be legal guardianship, and appointed D.W.'s foster parent as his legal guardian. The court ordered D.W.'s legal guardian to ensure sibling visitation took place with N.C. Minor and D.W. continued to visit one another. In a Department report filed on December 17, it was noted the two boys saw each other on Halloween.

On March 18, 2015, the juvenile court terminated Mother's and Father's parental rights. At the hearing, Father's counsel argued for the court to order legal guardianship, rather than adoption, as Minor's permanent plan. Father's counsel asserted adoption would interfere with Minor's sibling relationships. N.C.'s and D.W.'s attorney also argued against the termination of parental rights on the basis that termination would interfere with the half siblings' relationships. Counsel pointed out that N.C. and Minor lived together immediately after being detained, which counsel asserted was proof "they did have a relationship." Counsel requested that if the court ordered adoption as Minor's permanent plan, then the court refer the matter to postadoption mediation to determine if Minor's adoptive parents would permit contact between the half brothers.

The Department asserted no evidence had been presented reflecting the sibling relationship exception should be applied. The Department contended Minor and N.C. had not "had contact in some time due to the strained nature of the relationship." The juvenile court found the sibling relationship exception did not apply. The court ordered

adoption as Minor's permanent plan.  The court also referred the matter to postadoption mediation.

## DISCUSSION

Father contends the juvenile court erred by not applying the sibling relationship exception.  (§ 366.26, subd. (c)(1)(B)(v).)

If a juvenile court finds a dependent child is adoptable, then it will terminate parental rights unless one of the statutorily enumerated exceptions is applicable. (§ 366.26, subd. (c)(1).)  One of the enumerated exceptions provides that parental rights shall not be terminated if "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption."  (§ 366.26, subd. (c)(1)(B)(v).)

There is a split of authority as to which standard of review is applicable to a decision to not apply the parent-child bond exception:  (1) substantial evidence; (2) abuse of discretion; or (3) a hybrid of substantial evidence and abuse of discretion. (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425 [Fourth Dist., Div. Three applied the substantial evidence standard]; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 [Fourth Dist., Div. One applied the substantial evidence standard]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [First Dist., Div. Three applying the abuse of

8

discretion standard]; *In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449 [Second Dist., Div. Eight applying the abuse of discretion standard]; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 [Second Dist., Div. Seven applying the hybrid standard]; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 [Sixth Dist. applying the hybrid standard in a sibling relationship exception case].)

In Father's Appellant's Opening Brief, he presents the split of authority regarding the standard of review, but it is unclear which standard he is advocating for this court to apply. Father cites mostly law in his standard of review section, as opposed to also providing analysis, so we must infer what standard he would prefer. Based upon Father's citations to cases that discuss both substantial evidence and discretionary decisions, we infer that Father is advocating for the hybrid standard of review. Accordingly, we will apply that standard.

Under the hybrid standard, the issue of whether there is a beneficial sibling relationship is reviewed under the substantial evidence standard of review, while the abuse of discretion standard applies to the issue of whether ongoing contact is in the child's best interest. (*In re Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.)

We begin with the beneficial relationship issue, which requires the court take into consideration "the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, [and] whether the child shared significant common experiences or has existing close and strong bonds with a sibling." (§ 366.26, subd. (c)(1)(B)(v).) We apply the substantial evidence standard of review. (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.)

9

In April 2009, Grandparents became N.C.'s legal guardians. Minor was born in November 2009. At the time of the detention in this case, in 2013 all three children were residing with Grandparents; however, Mother said Minor and D.W. were "only temporarily living with the maternal grandparents." It is unclear from the evidence how long the three children lived together prior to being removed. It is possible Minor and D.W. lived with N.C. for several years at Grandparents' home, but it is equally possible that they lived with him for several days.

The three children were detained on March 18, 2013. Following the children's removal, N.C. and Minor lived together until April 25, 2013. Therefore, N.C. and Minor lived together for a little more than a month in foster care, and for an unidentified amount of time at Grandparents' home. It is also unclear for how long Minor and D.W. resided together. They were at Grandparents home together at the time of removal, so they lived together for some portion of their lives, but the exact length is unclear due to Mother stating the two were only there "temporarily." One could presumably speculate that Minor and D.W. resided together before temporarily moving to Grandparents' home. Accordingly, the evidence for the factor regarding the children being raised together in the same home is unclear.

The next issue is whether the children shared significant common experiences. There is little information in the record regarding shared experiences. The primary shared experiences concern removal and visits while in foster care.

In regard to whether there are existing close and strong bonds between the siblings, the evidence reflects Minor and D.W. enjoyed playing with one another during

visits. However, they would also play individually during visits. The children seemed to be comfortable in one another's company. This evidence provides substantial support for the finding that the children did not share a particularly strong bond. It seems Minor and D.W. were happy playmates, but did not have a brotherly connection. Similarly, the record reflects N.C. enjoyed visiting his younger brothers. Again, this evidence is substantial support for a finding that N.C. and Minor were friendly visitors—happy to see one another and spend time together, but not particularly close or bonded. For example, it does not appear the children cried when separated or were otherwise expressing emotions at the visits.

In sum, there is substantial evidence to support a finding that Minor did not have a beneficial relationship with D.W. and N.C. The children were happy to see one another, like friendly playmates, but substantial evidence reflects they were not bonded as siblings, they had few shared experiences, and it is unclear for how long they resided together. Accordingly, we conclude the juvenile court did not err.

Father, in his Appellant's Opening Brief, writes, "[A]ll the children lived together for more than three years, and [Minor] was three years old when he was removed from his grandparents." The record citation provided by Father leads to a page reflecting Minor was three years old at the time of detention, but does not reflect the children lived together for more than three years. Accordingly, we are not persuaded by Father's assertion that Minor lived with his half brothers for the first three years of his life.

11

Father's argument relies heavily on *In re Naomi P.* (2005) 132 Cal.App.4th 808. In *Naomi P.* the juvenile court applied the sibling relationship exception and the child welfare agency appealed that decision. (*Id.* at pp. 811, 821.) As a result, the appellate court applied the substantial evidence standard looking for evidence *in support* of the finding that the sibling relationship exception applied. (*Id.* at pp. 823-824.) The child at issue, Naomi, was detained shortly after birth and therefore formed a relationship with her siblings through visitation. (*Id.* at pp. 811-812.) The appellate court wrote, "We agree with the trial court court's assessment that '[l]iving together is not determinative'" in regard to the sibling relationship exception. (*Id.* at p. 824.) The appellate court remarked that the siblings had "'been a constant thread'" in Naomi's life, and affirmed the judgment. (*Id.* at pp. 824-825.)

Father asserts, "As in *Naomi P.*, all the siblings had been a constant thread in young [Minor]'s life." Father provides no record citation immediately following this assertion. (Cal. Rules of Court, rule 8.204(a)(1)(C) [provide record citations].) As explained *ante*, it is unclear to what extent D.W. and N.C. were a constant presence in Minor's life because it is unclear for how long the children resided together. It is also unclear how often N.C. visited Minor because, at the hearing on March 18, 2015, counsel for the Department remarked, "I don't believe [Minor] and [N.C.] have had contact in some time due to the strained nature of the relationship." No one contested this statement. In regard to visiting D.W., it is also unclear exactly how often they visited because in a Department report filed on December 17, it was noted the two boys saw each other on Halloween, i.e., approximately six weeks prior, which would indicate

12

the children were not visiting on a frequent, much less constant, basis.  In sum, we find

Father's reliance on *Naomi P.* to be unpersuasive because the evidence in the instant

case does not reflect the children were frequently present or significantly present in one

another's lives.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER

J.

We concur:

RAMIREZ

P. J.

KING

J.

13